UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Brahms Reed</u>

    v.                           Civil No. 08-cv-45-JL

<u>National Council of the</u>              Opinion No. 2010 DNH 018
<u>Boy Scouts of America,</u>
<u>Inc. and Boston Minuteman</u>
<u>Council, Inc.</u>

### **OPINION AND ORDER**

This personal injury action raises questions about the liability of a landowner who allows sledding on its property, as well as New Hampshire's application of the collateral source rule.  Brahms Reed has sued the National Council of the Boy Scouts of America, Inc. (the "BSA") and one of its affiliated entities, the Boston Minuteman Council, to recover for serious injuries he suffered falling off a sled during an outing with another one of BSA's chartered organizations, Troop 469, headquartered in Portsmouth, New Hampshire.  Reed, who was eleven years old at the time, alleges that these injuries occurred because scoutmasters from the troop failed to supervise him and because Boston Minuteman, who owns the property where Reed's accident occurred, failed to warn him of the dangers of sledding.

Boston Minuteman has moved for summary judgment, arguing that the dangers of sledding were obvious, even to an eleven-year

old, so it had no duty to warn of them.  In the alternative,
Boston Minuteman argues that Reed's claims against it are barred
by New Hampshire's recreational use statute, N.H. Rev. Stat. Ann.
§ 508:14.  BSA, whose own motion for summary judgment was denied
in an oral order,[1] has moved in limine to exclude evidence of
Reed's medical expenses and lost earnings from the upcoming
trial.  This court has diversity jurisdiction over this action
between Reed, a New Hampshire citizen, and the defendants, out-
of-state corporations.  See 28 U.S.C. § 1332(a)(1).

   After oral argument, the court grants Boston Minuteman's
motion for summary judgment because, as a matter of law, it had
no duty to warn Reed of the risks of sledding and, in the
alternative, there is no dispute that Boston Minuteman allowed
members of the general public to use the land in question for
recreational purposes, conferring immunity under the recreational
use statute.  As to BSA's motions in limine, the court rules that
(1) Reed cannot recover the medical expenses he incurred before
he reached the age of majority in this action, because the
financial responsibility for those expenses fell to his mother,
who is not a party here, (2) under the collateral source rule,
Reed may introduce evidence of any post-majority medical bills,

---

[1]Document no. 28.

even if they were "written off" by his providers as a result of
their agreements with his insurers, and (3) Reed cannot recover
future lost wages because he lacks the necessary expert testimony
discounting those sums to net present value.

I.   **Background**

        The facts relevant to the pending motions are more or less
undisputed.  At the beginning of the 2000-2001 school year, when
Reed was eleven years old, his mother registered him to
participate in scouting activities with Troop 469, which had been
organized by a group of parents at Portsmouth Middle School.  The
troop was what the BSA refers to as a "chartered organization,"
meaning that the parents had received a charter from the BSA that
entitled the troop to make use of BSA emblems, uniforms, scouting
manuals, and other literature.  Under the charter, though, the
troop retained "considerable flexibility in determining what
portions of the Scouting program should be emphasized in [its]
activities."  For example, BSA exercised no authority over the
troop's day-to-day activities or the selection, training, or
supervision of its scout leaders.

        Even the decision to issue the charter to Troop 469 was not
made by the BSA, but by Daniel Webster Council, a non-profit
organization itself chartered by the BSA.  Like the BSA, the

council had no involvement in the troop's day-to-day operations or the selection of its scout leaders.  The council did, however, provide some training to Troop 469's adult scoutmaster at a weekend course covering subjects like leading a troop, organizing activities, and handling emergencies.  For reasons that are not apparent from the record, neither Troop 469 nor the Daniel Webster Council was named as a defendant here.

In January 2001, Troop 469 embarked on an overnight camping trip to T.L. Storer Camp in Barnstead, New Hampshire, a facility owned by defendant Boston Minuteman.  Reed was the youngest scout to make the trip; the boys were joined by their scoutmaster and assistant scoutmaster, both adults with minor sons in the troop. While T.L. Storer charges for the use of its cabins--and Troop 469 had to pay a "facilities fee" to use them--members of the general public who wish to use the property for recreational purposes are allowed to do so for free.

The morning after their arrival, the scouts, accompanied by their scoutmasters, began sledding and snowboarding down a hill at the camp.  At some point, the boys began building a jump out of snow near the bottom of the hill; at some later point, both the scoutmaster and the assistant scoutmaster returned to the cabins to begin preparing lunch, leaving the scouts without adult supervision.  This was done in derogation of the BSA's Guide to

4

Safe Scouting, which provides that "winter activities must be supervised by mature and conscientious adults (at least one of whom must be age 21 or older) who understand and knowingly accept responsibility for the well-being and safety of the youth in their care . . . .   Direct supervision should be maintained at all times by two or more adults when Scouts are 'in the field.'" Nobody from Boston Minuteman warned the scouts of the dangers of sledding or snowboarding, and there were no signs to that effect posted anywhere at T.L. Storer.

Before the scoutmasters left, many of the scouts were sledding over the jump, while either sitting or standing on toboggans.  During this period, Reed noticed that some of the other scouts had stumbled, but not fallen, in attempting the jump while standing.  When Reed first attempted the jump while standing, he slipped and landed on his back, but was not hurt.

After the scoutmasters left, Reed attempted the jump a second time while standing.  This time, he landed awkwardly, breaking his right leg and injuring the growth plate.  This caused Reed's right leg to stop growing at the same rate as his left leg, necessitating a number of corrective surgeries and other interventions, the vast majority of which occurred while he was still a minor.  For reasons that are not apparent from the record, this action was not brought until after Reed had reached

the age of majority.  <u>See</u> N.H. Rev. Stat. Ann. § 508:8 (tolling the limitations period on actions by a minor until two years after he reaches the age of majority).

## II.  <u>Analysis</u>

### A.  **Boston Minuteman's motion for summary judgment**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In making this determination, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor."  <u>Mulvihill v. Top-Flite Golf Co.</u>, 335 F.3d 15, 19 (1st Cir. 2003).

Boston Minuteman moves for summary judgment on two independent grounds:  first, that Reed's claim against it is barred by New Hampshire's recreational use statute and, second, that Boston Minuteman had no duty to warn Reed of the risks of sledding because those risks are obvious, even to an eleven-year old.  Boston Minuteman is correct on both counts.

### 1.    The recreational use statute

The New Hampshire recreational use statute provides that "[a]n owner . . . who without charge permits any person to use land for recreational purposes . . . shall not be liable for personal injury . . . in the absence of intentionally caused injury or damage."  N.H. Rev. Stat. Ann. ("RSA") § 508:14, I. The New Hampshire Supreme Court has interpreted the phrase "any person," as it appears here, to mean "any person as a member of the general public.  Thus, for RSA 508:14, I to grant immunity, private landowners must permit members of the general public to use their land for recreational purposes."  Estate of Gordon-Couture v. Brown, 152 N.H. 265, 271 (2005) (citation omitted).

Reed acknowledges that he is seeking to hold Boston Minuteman liable, as the owner of the T.L. Storer Camp, for personal injury that was negligently, as opposed to intentionally, caused.  He argues, however, that § 508:14 does not apply because Boston Minuteman does not "permit members of the general public to use T.L. Storer for recreational purposes." As noted above, members of the general public who wish to use T.L. Storer for recreational purposes are allowed to do so free of charge, according to an affidavit submitted by a Boston Minuteman executive.  To attempt to dispute this, Reed relies on

solely on the testimony of the T.L. Storer "campmaster," that "[o]nly Boy Scouts and Cub Scouts can stay at the camp."[2]

A limitation on who can "stay at the camp," though, is not the same as a limitation on who can "use [the] land for recreational purposes," which is the relevant inquiry under the statute.  <u>Gordon-Couture</u>, 152 N.H. at 271.  As one of the decisions cited approvingly in <u>Gordon-Couture</u> makes clear, "a landowner need not allow all persons to use the property at all times" for recreational use immunity to apply.  <u>Snyder ex rel. Snyder v. Olmstead</u>, 634 N.E.2d 756, 761 (Ill. App. Ct. 1994) (citing <u>Johnson v. Stryker Corp.</u>, 388 N.E.2d 932, 934 (Ill. App. Ct. 1979)); <u>see also</u> <u>Holden ex rel. Holden v. Schwer</u>, 495 N.W.2d 269, 274 (Neb. 1993) ("a landowner need allow only some members of the public, on a casual basis, to enter and use his land for recreational purposes to enjoy the protection" of recreational use immunity).  Rather, a landowner may place certain "limitations on the use of the property, such as age restrictions, or hours of use," without forfeiting the protections of the statute.  <u>Johnson</u>, 388 N.E.2d at 935.

---

[2]Reed also relies on the campmaster's testimony that, during Troop 469's trip to T.L. Storer, the only people using the grounds were scouts and their leaders.  That does not serve to dispute Boston Minuteman's statement that it <u>permits</u> not only scouts, but members of the general public, to use the property.

Otherwise, owners would have to relinquish all control of their premises in order to attain recreational use immunity, with the likely result that most would simply declare their property completely off-limits to the public.  See id.  That result would contravene what the New Hampshire Supreme Court has identified as the purpose of recreational use immunity statutes, i.e., to encourage the opening of private lands for public recreation. Gordon-Couture, 152 N.H. at 268-269.  Because Boston Minuteman indisputably "permit[s] members of the general public to use [T.L. Storer] for recreational purposes," id. at 271, the recreational use statute applies, despite the fact that only scouts are permitted to spend the night at the camp.[3]

Relying on Soraghan v. Mt. Cranmore Ski Resort, Inc., 152 N.H. 399 (2005), Reed points out that recreational use immunity does not apply when "the injured entrant was on the property for

---

[3]Furthermore, Troop 469's payment of a "facilities fee" for the use of the cabins also does not negate Boston Minuteman's immunity.  The court of appeals has held that, as used in New Hampshire's recreational use statute, "'charge' means an actual admission fee paid for permission to enter the land for recreational purposes," not a fee for a specific service available after entering.  Hardy v. Loon Mtn. Recreation Corp., 276 F.3d 18, 20-21 (1st Cir. 2002).  Indeed, one of the cases cited for this proposition in Hardy specifically ruled that a per-person, per-night charge to Boy Scouts staying overnight in a building on government property had no effect on the government's recreational use immunity, since there was no charge to enter or use the property itself.  Wilson v. United States, 989 F.2d 953, 956-57 (8th Cir. 1993).

a purpose related to the landowner's business for which the landowner customarily charges." Id. at 403.  In Soraghan, the New Hampshire Supreme Court ruled that the statute did not bar a claim against the defendant ski resort by a plaintiff who had fallen on its property while walking to her car to retrieve her ski equipment, even though, because she had entered the property that day to watch her daughter participate in a race, the plaintiff had not paid the resort's entrance fee.  Id. at 400-04. The court reasoned that "[w]here the landowner customarily charges for access to its recreational facilities, the property is not being held open without charge to any member of the general public for recreational use."  Id. at 403.

Here, though, it is undisputed that Boston Minuteman does not "customarily charge for access to its recreational facilities" at T.L. Storer, so Soraghan is inapposite.[4]  Boston

---

[4]Reed nevertheless argues that Boston Minuteman allows access to the camp only "to further scouting objectives," which is consistent with Boston Minuteman's "business purposes" and therefore tantamount to a "charge" because "consideration need not be monetary."  Assuming, dubitante, that a "charge" for purposes of § 508:14 includes a non-monetary condition on an entrant's "objectives," there is simply no evidence that Boston Minuteman imposes any such restriction on the entrants to T.L. Storer.  Cf. Wilson, 989 F.2d at 957-58 (rejecting the argument that recreational use immunity does not apply because the government's "purpose in allowing admission to [an open military installation] is to develop public goodwill" in the armed services, at least without evidence that visitors to the property were "encouraged in any way to join the Army").

Minuteman is entitled to summary judgment on the ground that New Hampshire's recreational use statute bars Reed's claim.

### 2.    The open and obvious danger doctrine

Boston Minuteman is also entitled to summary judgment on the alternative ground that it had no duty to warn Reed of the dangers of sledding.  Whether a duty exists in a particular set of circumstances is a question of law to be decided by the court. See, e.g., Everitt v. Gen. Elec. Co., ___ N.H. ___, 979 A.2d 760, 762 (N.H. 2009).  As a matter of law, "a defendant generally has no duty to warn and instruct a plaintiff of obvious dangers about which the plaintiff's knowledge and appreciation equal the defendant's."  Allen v. Dover Co-Recreational Softball League, 148 N.H. 407, 422 (2002).  Thus, in the case of a dangerous condition on the landowner's premises, "the fact that the condition is obvious is usually sufficient to apprise [the plaintiff], as fully as the possessor, of the full extent of the risk involved in it," relieving the landowner of any duty to warn.  Dunleavy v. Constant, 106 N.H. 64, 67 (1964) (quoting Maxfield v. Maxfield, 102 N.H. 101, 103-04 (1959)).

In this context, "'[o]bvious' means that both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising

11

ordinary perception, intelligence, and judgment." Restatement (Second) of Torts § 343A(1) cmt. *b* (1965).  Because Reed was a child at the time of the accident, however, he is not held to the standard of conduct of "a reasonable man," but rather "a reasonable person of like age, intelligence, and experience under the circumstances." Id. § 283A; accord Dunleavy, 106 N.H. at 67 (noting that children "may fail to observe conditions which an adult might reasonably be expected to discover").

There is no question that the danger of sledding over the jump while standing would have been apparent to a reasonable person of Reed's age, intelligence, and experience, particularly in light of the circumstances.  Reed had seen other scouts stumble in attempting to negotiate the jump while standing and, when he tried it himself the first time, slipped and landed on his back.[5]  This is not a case, then, where the nature of the hazard could reasonably have been overlooked, even by a child. Cf. Wheeler v. Monadnock Cmty. Hosp., 103 N.H. 306, 308 (1961)

---

[5]There is no evidence that the T.L. Storer campmaster or anyone else from Boston Minuteman knew that the scouts had built the jump, or that any similar activity had occurred on the property previously.  Thus, while Reed argues that the obvious nature of a danger does not negate the property owner's nature to warn of it when the owner "should anticipate the harm despite such knowledge or obviousness," Restatement (Second) of Torts § 343A(1), there is no evidence that Boston Minuteman should have anticipated such a danger here.

(ruling that a retaining wall "was a known dangerous condition not likely to be appreciated by young children" where "from the side from which [the child] approached it had the appearance of a low curb"); Dunleavy, 106 N.H. at 68 (refusing "to assume that the risk of falling over [a] jack-handle in the dark was one a child of six would appreciate even though he might be assumed to appreciate the risk of falling over it in the daylight").

Even aside from Reed's immediate experience with the jump, moreover, "common experience in sledding suggests that sledding over a hill, mound, or similar terrain has a tendency to cause the sledder to go into the air." Gould v. United States, 994 F. Supp. 1177, 1183-85 (W.D. Mo.) (ruling that the danger of injury from sledding over a terrace was open and obvious), rev'd in part, 160 F.3d 1194 (8th Cir. 1998).[6]  Sledders build and use jumps for the very purpose of "going into the air"--and

---

[6]While the district court in Gould ruled that neither of the two plaintiffs could recover due to the obviousness of the danger, the appeals court upheld that ruling as to one plaintiff but reversed it as to the other.  160 F.3d at 1197.  As the appeals court reasoned, the difference was that, after sledding over the terrace, the first plaintiff had merely "become airborne" but the second plaintiff had been launched at least four feet in the air.  Id. at 1196.  The appeals court ruled that the second plaintiff "could not reasonably have been expected to discover[] the risk of being propelled more than four feet high," such that it was not open and obvious.  Id. at 1196-97.  Here, though, there is no evidence that Reed came off the jump at an unexpected height or, indeed, higher than he or any of the other scouts had in their previous attempts.

13

experiencing the concomitant challenge of trying to land successfully.  It is hard to imagine that any sledder (except for perhaps the very young) needs to be told that such success is not guaranteed, and that failure may cause serious injury.

Consistent with this view, courts have generally found the danger of various sledding-related mishaps to be obvious--even to children--and therefore necessitating no warning as a matter of law.  See, e.g., Barnett v. City of Lynn, 745 N.E.2d 344, 348 (Mass. 2001) ("[c]ommon sense dictates that the danger of sledding down stairs leading to a road well traveled by motor vehicles would be open and obvious even to an eleven or twelve year old child"); Mothershead v. Greenbriar Country Club, Inc.. 994 S.W.2d 80, 88 (Mo. App. Ct. 1999) (ruling that the danger of serious injury from sledding into trees at the bottom of a slope was obvious to a 16 year-old); Offringa v. Borough of Westwood, 41 A.2d 18, 20 (N.J. 1945) (ruling that 18 year-old plaintiffs, "blessed with the understanding and the mentality of the average boy and girl of their age group," would appreciate the danger of sledding around a barrier and into a street); see also Friedman ex rel. Friedman v. Park Dist. of Highland Park, 502 N.E.2d 826, 834 (Ill. App. Ct. 1986) (upholding verdict for defendant landowner on 8-year-old plaintiff's claim arising out of her sledding into a fence post because that danger was obvious,

14

particularly in light of the plaintiff's prior knowledge of the hill); Pitre v. La. Tech. Univ., 673 So. 2d 585, 596 (La. 1996) (relying on the "obvious and apparent" danger of sledding into a utility pole at the bottom of a hill to rule that the property owner had no duty to warn a college student of it).

Accordingly, the court rules that Boston Minuteman had no duty to warn Reed of the danger of sledding over the jump while standing, because that danger would have been obvious to a reasonable person of Reed's age, intelligence, and experience under the circumstances.  On this basis, as well as on the basis of the recreational use immunity statute, Boston Minuteman is entitled to summary judgment on Reed's failure to warn claim.[7]

---

[7]While Reed's second amended complaint alleges that Boston Minuteman "failed to provide adequate safety personnel to assist [him] in obtaining medical assistance[] following his traumatic fall," he affirmatively disclaimed any such theory against Boston Minuteman in his surreply to its summary judgment motion. Furthermore, Reed essentially conceded at oral argument that he lacked the expert medical testimony necessary to recover on that theory or, indeed, anything but speculation to support it.  Cf. Room v. Caribe Hilton Hotel, 659 F.2d 5, 7-8 (1st Cir. 1981) (upholding direct verdict for defendant on claim for negligent delay in providing medical care in the absence of expert testimony that it caused plaintiff any further physical injury).

**B.    The BSA's motions in limine**

**1.    The motions to exclude Reed's medical bills**

The BSA has filed two motions in limine seeking to exclude evidence of Reed's medical expenses from the upcoming trial. First, the BSA argues that only Reed's mother--who is not a plaintiff here--can recover for the medical expenses incurred on his behalf before he reached the age of majority.  Second, the BSA argues that, insofar as Reed seeks to recover medical expenses he incurred after he reached the age of majority (which appear to amount to no more than $1,000 of the nearly $70,000 in medical expenses allegedly caused by the sledding accident) he should not be allowed to introduce the medical bills as proof of those expenses, because much of those charges was "written off" by Reed's providers under their contracts with his insurers.

Under New Hampshire law, "a parent rather than a minor is liable for the minor's medical or hospital expenses when the minor is living with or supported by his parents.  As result, . . . the parent, rather than the child, is entitled to recover the medical expenses . . . incurred on his behalf during his minority due to [an] accident" negligently caused by another. Blue Cross/Blue Shield of N.H.-Vt. v. St. Cyr, 123 N.H. 137, 141 (1983).  So it is Reed's mother, rather than Reed himself, who has the right to recover against the BSA for the medical

16

expenses, caused by its alleged negligence, that he incurred as a minor; there is no dispute that Reed was living with and supported by his mother during that time.  But it is Reed, and not his mother, who is the plaintiff here.[8]  Accordingly, there is simply no claim in this action for recovery of the medical expenses incurred on Reed's behalf while he was a minor.  The BSA's motion to exclude evidence of those expenses is granted.[9]

That does not stop Reed from attempting to recover the medical expenses he incurred after he reached the age of majority (though, again, those expenses total only around $1,000).  Even as to those expenses, though, the BSA argues that Reed may not introduce the corresponding medical bills, because "the medical providers will testify that they agreed to 'write off' all amounts in excess of the contract rate" established by their contract with Reed's health insurers.  The BSA argues that the contract rate, rather than the face amount of the bills, is therefore all Reed can recover.

---

[8]Because, as noted supra, this case was not brought until after Reed attained the age of majority--and thus nearly seven years after the accident--the statute of limitations had already run on any claim by Reed's mother.  See, e.g., Garay v. Overholtzer, 631 A.2d 429, 436-40 (Md. 1993) (collecting cases).

[9]As Reed suggests in his objection to the motion, he may still introduce evidence of the medical care he received during that time as proof of the pain and suffering and lost enjoyment of life he experienced during that period.

As the BSA acknowledges, this court has rejected similar arguments as at odds with New Hampshire's collateral source rule. See Aumand v. Dartmouth Hitchcock Med. Ctr., 611 F. Supp. 2d 78, 90-92 (D.N.H. 2009) (Laplante, J.); Williamson v. Odyssey House, Inc., 2000 DNH 238, 1-3 (DiClerico, J.).  That rule "provides that 'if a plaintiff is compensated in whole or part for his damages by some source independent of the tort-feasor, he is still permitted to make full recovery against the tort-feasor.'" Aumand, 611 F. Supp. 2d at 90 (quoting Williamson, 2000 DNH 238, 2 (further quotation marks and bracketing omitted)).  Thus, this court has refused "to exclude evidence of the billed cost of medical services" in favor of "the amounts actually paid" in satisfaction of those costs by the plaintiff's health insurers. Aumand, 611 F. Supp. 2d at 91; Williamson, 2000 DNH 238, 1.

The BSA nevertheless argues that the collateral source rule does not apply to charges billed but later "written off" by a plaintiff's medical provider, since those amounts were never "paid" by a collateral source or, indeed, anybody.  This argument has found favor in several unpublished decisions by the New Hampshire Superior Court, cited by the BSA, that excluded evidence of such "written off" sums.  See Taranov v. Vella, No. 05-C-302, slip op. at 2 (N.H. Super. Ct. Aug. 12, 2009) (Lynn, C.J.); Sica v. Britton, No. 05-C-213, 2007 WL 1385661 (N.H.

Super. Ct. Feb. 1, 2007) (Houran, J.); Cook v. Morin-Binder, No. 05-C-319, 2007 WL 6624298 (N.H. Super. Ct. Jan. 12, 2007) (Houran, J.); Debski v. JMC Equities Corp., No. 97-C-1161, slip op. at 5 (N.H. Super. Ct. July 7, 1999) (Sullivan, J.).  But there are also a number of other unpublished New Hampshire Superior Court decisions to the contrary, which the BSA does not cite.  See Michaud v. Bridges, No. 07-C-055, 2008 WL 4829387 (N.H. Super. Ct. June 30, 2008) (Brown, J.); Veilleux v. Noonan, No. 06-C-207, 2008 WL 6016234 (N.H. Super. Ct. Apr. 7, 2008) (Houran, J.); Gulluscio v. Hall, No. 06-C-0045, 2007 WL 6647429 (N.H. Super. Ct. Oct. 1, 2007) (Mohl, J.); Plummer v. Optima Health-Catholic Med. Ctr., No. 98-C-1010, 2000 WL 35730973 (N.H. Super. Ct. Nov. 13, 2000) (McHugh, J.).[10]

The BSA also relies on cases from other jurisdictions to support its position.  See Hanif v. Hous. Auth., 246 Cal. Rptr.

---

[10]It should be noted that the same judge who issued Sica and Cook, which the BSA cites in support of its position, later explained that those orders do not approve "a sweeping proposition of law that only those medical bills actually paid by or for a plaintiff may be claimed at trial," but simply that "the law permits, in appropriate circumstances as determined on a case by case basis, consideration of write offs by a plaintiff[']s health care provider."  Veilleux, 2008 WL 6016234, at *1 n.3.  In Veilleux, then, that judge refused to grant the very same relief the BSA seeks here, i.e., to "bar the plaintiffs from introducing evidence of medical bills in excess of amounts actually paid by a third party and accepted as payment in full by medical providers."  Id. at *1 (footnote omitted).

192, 195-97 (Cal. Ct. App. 1988); <u>Coop. Leasing, Inc. v. Johnson</u>, 872 So.2d 956, 958-60 (Fla. App. Ct. 2004); <u>Bates v. Hogg</u>, 921 P.2d 249, 252-53 (Kan. App. Ct. 1996); <u>Moorhead v. Crozer Chester Med. Ctr.</u>, 765 A.2d 786, 790-91 (Pa. 2001).[11]  Again, though,

_____

[11]The court notes that, of these cases, only <u>Moorhead</u> in fact supports the BSA's position here.  <u>Cooperative Leasing</u> applied a Florida statute that, in essence, rejects the collateral source rule, reducing a plaintiff's damages award "'by the total of all amounts which have been paid for [his] benefit,'" but also providing that "'benefits received under Medicare . . . shall not be considered a collateral source.'" 872 So. 2d at 959-60 (quoting Fla. Stat. § 768.76).  Reasoning that the statute "excludes Medicare benefits as a collateral source because the federal government has a right to reimbursement . . . for payments it has made on [a plaintiff's] behalf," the court held that, as used in the statute, the term "benefits received" does not include "the amount that was written off by her medical providers" because "the government's right to reimbursement does not extend to amounts never actually paid." <u>Id.</u>  Thus, allowing a plaintiff to recover those amounts "would result in a windfall that is contrary to the legislative policy evidenced by" the statute.  <u>Id.</u>  New Hampshire, of course, has no such statute, but follows the common-law collateral source rule. In that version, the collateral source rule contemplates just such a windfall to the plaintiff, as discussed <u>infra</u>.

And both <u>Hanif</u> and <u>Bates</u> have since been restricted so as to make them inapposite here.  As discussed <u>infra</u> at note 11, the Kansas Supreme Court has clarified that "the <u>Bates</u> decision is limited to cases involving Medicaid" as the third-party payor, so that the collateral source rule does apply to billed amounts written off by any other public or private insurer, including Medicare.  <u>Rose v. Via Christi Health Sys., Inc.</u>, 78 P.3d 798, 803 (Kan. 2003).  The California Court of Appeals has since clarified that <u>Hanif</u> did not prevent plaintiffs from introducing "evidence of the amounts billed, as they reflected on the nature and extent of plaintiffs' injuries and were therefore relevant to their assessment of the an overall general damage award." <u>Katiuzhinsky v. Perry</u>, 62 Cal. Rptr. 3d 309, 314 (Cal. Ct. App. 2007).  Here, in contrast, the BSA wants to exclude evidence of

there is substantial caselaw to the contrary.  See, e.g., Pipkins v. TA Operating Corp., 466 F. Supp. 2d 1255, 1259-62 (D.N.M. 2006); Lopez v. Safeway Stores, Inc., 129 P.3d 487, 496 (Ariz. Ct. App. 2006); Mitchell v. Haldar, 883 A.2d 32, 40 (Del. 2005); Hardi v. Mezzanotte, 818 A.2d 974, 985 (D.C. 2003); Olariu v. Marrero, 549 S.E.2d 121, 123 (Ga. Ct. App. 2001); Bynum v. Magno, 101 P.3d 1149, 1159-60 (Haw. 2004); Wills v. Foster, 892 N.E.2d 1018, 1033 (Ill. 2008); White v. Jubitz Corp., 219 P.3d 566, 583 (Or. 2009); Haselden v. Davis, 579 S.E.2d 293, 295 (S.C. 2003); Papke v. Harbert, 738 N.W.2d 510, 536 (S.D. 2007); Acuar v. Letourneau, 531 S.E.2d 316, 322-23 (Va. 2000); Leitinger v. DBart, Inc., 736 N.W.2d 1, 13-14 (Wis. 2007).

The New Hampshire Supreme Court appears to take the majority view.  That court has expressly rejected the argument that

> the plaintiff cannot recover unless he has paid for the services rendered or incurred a legal liability therefor.  On principle it should make no difference to the defendants whether the payment was made by virtue of friendship, philanthropy or contract with a third party . . . .  It is no concern of the wrongdoer whether the bills for medical expenses were paid by an indulgent uncle, a liberal employer or a relief association.

---

Reed's medical bills altogether.  While Hanif does hold that a plaintiff cannot recover for medical bills in excess of "the actual amount paid" by a third-party insurer, 246 Cal. Rptr. at 197, this court disagrees with that understanding of the collateral source rule, as explained supra.

Clough v. Schwartz, 94 N.H. 138, 141 (1946) (emphasis added).
The BSA does not explain, with reference to the cases it cites or
otherwise, why it nevertheless should make a difference that a
plaintiff's providers agreed to accept less for their services
from third parties paying on the plaintiff's behalf than the
provider would have accepted from the plaintiff himself.

    And the vast majority of courts have held that it makes no
difference, because--consistent with the view of the New
Hampshire Supreme Court in Clough--"the focal point of the
collateral source rule is not whether an injured party has
'incurred' certain medical expenses.  Rather, it is whether a
tort victim has received benefits from a collateral source," and
"amounts written off are as much of a benefit" to the plaintiff
"as are the actual cash payments made by his health insurance
carrier to the health care providers."  Acuar, 531 S.E.2d at 322;
see also, e.g., Pipkins, 466 F. Supp. 2d at 1260-61; Lopez, 129
P.3d at 495; Bynum, 101 P.3d at 1156; Wills, 892 N.E.2d at 1030;
White, 219 P.3d at 579-80.

    Indeed, even if a provider agrees to accept less from the
plaintiff himself by "forgiving" all or part of a bill--a
scenario identical to a "write-off" in the sense that not all of
the billed amount is ever paid by anyone--the collateral source
rule would still apply to the forgiven amount, because "the fact

22

that the doctor did not charge for his services . . . does not prevent [the plaintiff's] recovery for the reasonable value of the medical services." Restatement (Second) of Torts § 920A *cmt. c*(3), at 515 (1979).  Not only has the New Hampshire Supreme Court cited approvingly to § 920A of the Restatement in explaining this state's verison of the collateral source rule, see Moulton v. Groveton Papers Co., 114 N.H. 505, 509 (1974), that court has recognized that a plaintiff who receives medical care for less than its reasonable value is nevertheless "entitled to recover the full value of the services from the third-party tort-feasor." Lefebvre v. Gov't Employees Ins. Co., 110 N.H. 23, 25 (1969) (noting that, under the collateral source rule, a plaintiff who received medical care with a reasonable value of $918 in a military hospital but had to pay only $31.50 for it could have recovered $918 from the party who injured her).

A number of courts have reasoned that because "write-offs" are the same as free medical services in this sense, the collateral source rule applies to both. See, e.g., Pipkins, 466 F. Supp. 2d at 1260-61; Lopez, 129 P.3d at 495; Bynum, 101 P.3d at 1156; Wills, 892 N.E.2d at 1030-31; White, 219 P.3d at 579-80.[12]  The BSA and the cases it cites do not question that the

---

[12]Other courts characterize "write-offs" as flowing from the plaintiff's insurance policy, reasoning that to deprive the

collateral source rule encompasses medical services for which the provider collects no fee--as opposed to a reduced fee--nor do they explain why these two materially identical situations should lead to opposite outcomes.

Instead, the BSA and most of its authorities rely on comment *h* to § 911 of the <u>Restatement (Second) of Torts</u>.  See <u>Hanif</u>, 246 Cal. Rptr. at 643; <u>Coop. Leasing</u>, 872 So.2d at 958; <u>Moorhead</u>, 765 A.2d at 790; <u>Sica</u>, No. 05-C-213, slip op. at 3; <u>Cook</u>, No. 05-C-319, 2007 WL 6624298, slip op. at 4; <u>Debski</u>, No. 97-C-1161, slip op. at 5.  That comment, entitled "*Value of services rendered*," appears in the section of the <u>Restatement</u> defining "Value," and provides in relevant part that

> The measure of recovery of a person who sues for the value of his services tortiously obtained by the defendant's fraud or duress, or for the value of services rendered in an attempt to mitigate damages, is the reasonable exchange value of the services at the place and time . . . .

---

plaintiff of the benefit of the write-offs would be to deprive him of the benefit of his insurance contract in violation of the collateral source rule.  See, e.g., <u>Hardi</u>, 818 A.2d at 985; <u>Olariu</u>, 549 S.E.2d at 123; <u>Acuar</u>, 531 S.E.2d at 322.  Relying on this analogy, at least one court has reasoned that the collateral source rule applies to write-offs by private insurers (and Medicare, which the court considered to be materially the same as private insurance because it requires enrollees to pay premiums) but not Medicaid.  See <u>Rose</u>, 78 P.3d at 806.  But this court need not decide here whether New Hampshire would follow that unique approach, because there is no indication in the record that Medicaid was the insurer in question.

. . .

> When the plaintiff seeks to recover for expenditures
> made or liability incurred to third persons for
> services rendered, normally the amount recoverable is
> the reasonable value of the services rather than the
> amount paid or charged.  If, however, the injured
> person paid less than the exchange rate, he can recover
> no more than the amount paid, except when the low rate
> was intended as a gift to him.

Restatement (Second) of Torts § 911 *cmt*. h, at 476-77.

The BSA and its authorities, however, ignore the first sentence of this comment, which makes clear that it applies only in valuing services the plaintiff gave as a result of the defendant's tort, or that the plaintiff obtained "in an attempt to mitigate damages."  And insofar as medical care necessitated by the plaintiff's injury could be considered part of "an attempt to mitigate damages" within the meaning of this comment, see id. § 919(2), at 507, the Restatement elsewhere makes clear that "[t]he value of medical expenses made necessary by the tort can ordinarily be recovered although they have created no liability or expense to the injured person, as when a physician donates his services. (See § 920A)." Id. § 924 cmt. *f*, at 527.  So even if § 911 comment *h* generally limits the plaintiff's recovery for the services he obtained from a third party to "the amount paid, except when the low rate was intended as a gift," then § 924 comment *f* creates an exception to that rule for "medical

expenses."  See Lopez, 129 P.3d at 493-94; Bynum, 101 P.3d at
1159-60; Wills, 892 N.E.2d at 1028; White, 219 P.3d at 581 n.15;
Moorhead, 765 A.2d at 795 (Nigro, J., dissenting).

The BSA makes no attempt to reconcile § 924 comment *f* with
its reading of § 911 comment *h*--in fact, neither the BSA nor any
of the cases it cites but one even acknowledges § 924 comment *f*,
and that case, Moorhead, simply declares without explaining that
the court finds § 911 comment *h* "to be more applicable to the
instant case."  765 A.2d at 791 n.4.  The BSA's proposed reading
would nullify not only § 924 comment *f*, but also § 920A comment
*c*(3), which, again, specifically provides that "the fact that a
doctor did not charge for his services or the plaintiff was
treated [for free] in a veterans hospital does not prevent his
recovery for the reasonable value of the services."  It would rob
that provision of all meaning if § 911 comment *h* indeed limited
recovery in this context to "no more than the amount paid"
because "the injured person paid less than the exchange rate."
There is no reason to think the New Hampshire Supreme Court would
read the Restatement in this self-contradictory manner.  Cf.
LaChance v. U.S. Smokeless Tobacco Co., 156 N.H. 88, 97 (2007)
(noting the court's "practice of attempting to construe statutes
that deal with similar subject matter harmoniously").

26

The BSA and some of the cases it cites also point out that requiring the defendant to compensate the plaintiff for sums he or she never paid in the first place provides the plaintiff with a "windfall."  See, e.g., Moorhead, 765 A.2d at 790; Taranov, No. 05-C-302, slip op. at 2.  But awarding that windfall to the plaintiff, rather than to the defendant, is one of the principal aims of the collateral source rule.  See Aumand, 611 F. Supp. 2d at 91 (citing Restatement (Second) of Torts § 920A cmt. b, at 514).  Yet, the BSA protests, when medical charges have been "written off" rather than paid, exempting them from plaintiffs' recovery does not in fact award any windfall on defendants--"it merely means that they will not have to pay for expenses that have not been incurred."  Taranov, No. 05-C-302, slip op. at 2.

This argument ignores the reality that, as just discussed, when a medical provider agrees to "write-off" an amount it would otherwise charge, that confers just as much of a benefit on the plaintiff (and, if disallowed as an element of damages, would in fact confer just as much of a windfall on the defendant) as if the "written off" amount had been paid by a third party.  See, e.g., Acuar, 531 S.E.2d at 322.  As the New Hampshire Supreme Court's decision in Clough teaches, the collateral source rule applies to all benefits the plaintiff receives from third parties as a result of his injuries by the defendant, regardless of their

27

nature.  94 N.H. at 141. In other words, the rule "does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him." Restatement (Second) of Torts § 920A cmt. *b*, at 514.

Accordingly, the BSA has failed to convince this court that its decisions in Aumand and Williamson were wrong in refusing to exclude evidence of the billed cost of medical services in favor of the amounts actually paid in satisfaction of those costs by the plaintiff's health insurers.  This is not to say, as this court explained in Aumand, that New Hampshire's collateral source rule bars a defendant from "questioning the face amounts of the medical bills as equivalent to the reasonable value of [the plaintiff's] medical services," which, of course, is the proper measure of those damages under New Hampshire law.  611 F. Supp. 2d at 90-92 & n.13.  But unless and until this state's version of the collateral source rule is changed by the New Hampshire legislature or New Hampshire Supreme Court, this court will continue to apply it to billed amounts "written off" by a plaintiff's providers, in accordance with existing law here and in the vast majority of other jurisdictions.  The BSA's motion to exclude Reed's post-majority medical bills from evidence on this basis is denied.

### 2.    The motion to exclude evidence of Reed's lost wages

Finally, the BSA moves to preclude Reed from offering evidence as to any future lost wages he has suffered as a result of the accident.  The BSA points out that, under New Hampshire law, "an award for future damages must be reduced to present value and, given the complexity of the modern economic environment, . . . the reduction must be based upon specific economic evidence and not merely upon personal knowledge the jury may or may not possess."  Hutton v. Essex Group, Inc., 885 F. Supp. 331, 334 (D.N.H. 1994).  Furthermore, "the plaintiff bears the burden of coming forward with evidence of the proper rate of discounting," either through the testimony of an economic expert or other "economic data" supported by "a proper foundation."  Id. at 334-35.  Reed does not dispute these requirements, nor does he claim to have any evidence to satisfy them.  So he cannot seek recovery for any lost wages he allegedly will suffer in the future, i.e., from the time of trial going forward.  The BSA's motion to exclude evidence of future lost wages is granted.

III. **Conclusion**

Boston Minuteman's motion for summary judgment[13] is GRANTED. The BSA's first and third motions in limine[14] are GRANTED but its second motion in limine[15] is DENIED.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  February 3, 2010

cc:  John W. Laymon, Esq.
     Francis X. Quinn, Jr., Esq.
     Jonathan M. Shirley, Esq.
     Michael J. Mazurczak, Esq.
     Erin J.M. Alarcon, Esq.

--------

[13]Document no. 28.

[14]Document nos. 46, 48.

[15]Document no. 47.